If our clerk could call our case for this morning. 124-1139, People v. Mercedes, Austin. Okay. So, we have reviewed the briefs in record manner and are familiar with the authorities that you've cited, so you can take that into account in your presentations. We've allotted 20 minutes aside with an additional 5 minutes for the appellant for rebuttal. With that, we'll get started. Thank you, Your Honor. My name is Doug Hoff. I'm with the DePaul College of Law Criminal Appeals Clinic, and I'm representing Ms. Austin. Will you please speak a little louder? We have a fan behind us. Thank you. Certainly. And you've got people all the way in the back. All the way in the back. I'll try to belt it out to the last row. My name is Doug Hoff. I'm with the DePaul Criminal Appeals Clinic, and I'm here representing Ms. Austin. May it please the Court? Counsel? The sole question before this Court is, did the police, in this case, conduct a lawful traffic stop of Ms. Austin, which resulted in her arrest in this case? From the evidence presented at the motion to quash here and below, as well as at the stupidly benched trial, the answer is no. The State proffered two justifications for this traffic stop, and both are wrong. Both are wrong for the same reason, because they are mere conclusions that Ms. Austin, or the car that Ms. Austin was in, was subject to a stop. It was a conclusion that the car had somehow been involved in an attempt retail theft, and there was a conclusion that the car was parked illegally. But since the State did not present any facts to support either of these conclusions, the stop is based on a mere hunch, and therefore was illegal. First, the State claimed that this was a traffic stop, that the car was parked illegally. That is what Officer Giesles testified as to why they conducted the stop. I said, conducted the traffic stop, saw that the car was parked illegally, and proceeded from there. So that is where the Fourth Amendment seizure happened, when this car was stopped. That was undisputed at trial. Let me just ask you, is it even a stop for the officer to approach the car, and once they approach the car, they can see in the window the clothes with tags on them? At what point is there a stop? Because the car is already stopped.  There are consensual seizures, or consensual encounters under these circumstances. The State cites the Ludeman, which is the classic one here. But here the police officer very clearly stated he was conducting a traffic stop. And in fact, the State stipulated that at the stipulated bench trial and at the hearing. So the party stipulated that at the point that the police officer goes to, I think it's, isn't it a female police officer? You said he, but I think it's a she. But in any event, the officer approaches the car, everybody agrees that's a stop. Yes, that was a stop. Even if the car was already stopped. Yes, a stop can be really sort of a hold. You could be standing there and you could still be stopped. Correct. If there's a show of authority, lights, whatever, so that a reasonable person in that situation would not feel free to leave. Now, at the hearing below, this was all laid out as what was going to be at issue. And the State did not argue this was a consensual encounter, did not ask the officer additional questions as to why he cared. No, it did seem that everybody kind of agreed that at the point the officer approached it was a stop. I'm just, yeah, I'm just wondering why everyone agreed to that. We could ask them. I could see why you would agree to that. I can ask them why they agreed to that. But, yeah. So, yeah, it was pretty much off the table at that point. Okay. And so there you have the seizure. There's the Fourth Amendment seizure. It's a traffic stop. Nobody disputes that traffic stops are Fourth Amendment seizures. So that... Your argument turns on this question of whether or not the car was parked or was standing under the menace of the car. Right. That is certainly what we're saying is that it was standing rather than stopped. Right. But wouldn't that be subject to some sort of good faith reason? You know, even if the officer was mistaken, why wouldn't that fall within that good faith exception? Well, there's a couple of reasons. Well, first of all, again, this was just a conclusion. It was illegal. There's two parts of it. There's one that has been primarily the focus of the argument, whether it's standing or parked. There's the other part is why was this illegal? This officer never testified standing, parked, whatever, that it was illegal, that it was in front of a hydrant, that it was in a loading zone, that it was in otherwise someplace where it shouldn't have been, where it was up on a sidewalk. We don't know because the officer never elaborated on why he thought this was illegal regardless of what it was. So even if you had some sort of mistake, that had to be... Well, it would have to be reasonable. It can't just be a mistake. It has to be reasonable. So there was no reference as to whether or not it was... I understand you're saying standing, but double parked? No. And no testimony with respect to whether it was actually in a space versus... I'm struck with that. Okay. Anything like that. So it was really those parts, that there's no facts to support the idea that this was illegally anything, stopped standing. And then there's the question of whether it was actually parked or whether it was standing. Now, if it had people in it, it's standing. That's very clear. And any mistake about that by the police officer would have to be reasonable. Now, this hasn't really been elaborated on by any of the briefing, but the state's position implicitly is that a Chicago police officer can reasonably not know the difference between standing and parking. That he basically couldn't reasonably not know when he or she could issue a parking ticket, which does not seem reasonable at all. It's a pretty... I spent two years in traffic court as a new judge, and I never heard this. Well, you can't be a police officer. Yeah. It would be... If there was anything like black-letter traffic law, I would think that standing versus parking would be it. But I can see why a lot of parking tickets didn't come up in traffic courts. It's easier to just send in the money. And also, of course, it doesn't matter. In fact, the trial judge didn't care about that because ultimately he said there was a basis for the stop. That is the other part of this, is that the court below sort of brushed off this part of the argument, basically standing, parking. He probably didn't know the difference either. Could be. We don't know the background of spending time in traffic court. But, again, we had this first argument, which was, in fact, all laid out at the motion of boss hearing. This was in the defense's opening statement. So if the state had facts that would show that this car was, in fact, illegally something, certainly could have elaborated on them with its cross of Dr. Islet, or, excuse me, Officer Islet, or, you know, presented some other evidence to show that it was not, that it was illegally standing or parked. And as far as an error of fact, the fact would be, did, was the police officer erroneous, did he or she erroneously believe the car was unoccupied, so therefore it was parked? The officer never testified to that, never said, I didn't, I couldn't tell if there was anybody in there when they pulled up behind the car. So assuming we agree with you that, you know, the car was not in an illegal posture, can you address the Terry stop? So there is your Terry stop. There is your traffic stop right there. But they also had, looking big picture, they also had the report from the store security that this is the car, this is the license plate, and this is what we believe happened. Yeah. There is that. That also is just a conclusion. It's, I guess I have to probably clear up something I think got a little muddled in the briefing. I, reviewing the record from the hearing and from the stipulated bench trial, I, there is nothing to suggest that this call actually came from a, the loss prevention officer at a store. Well, does that matter? When the officer gets over their radio, an alert, and they get a description of the car, and lo and behold, the car that they see matches the description. Pardon me. Why isn't that enough? Well, that is certainly enough to investigate. It's just not enough to make some sort of inquiry. It is not enough for a Fourth Amendment seizure. Well, what do you think has to be reported in that call in order to make it enough for a Fourth Amendment, and we're talking an investigative stop, not a search, but a, what we call a minimal seizure. A Terry stop-like seizure. Sure. And what do you think has to be in that call? Does it have to report a crime actually occurred? Does it have to report suspicious activity? Does it have to report just, hey, look for a black car with two women in it? What does it have to report? So it has to contain some sort of facts that would support a reasonable suspicion. Right. So there has to be some sort of objective facts that the officers can verify, which they did. The car match, when they go over the car, and in the car, they see contraband, right? Sure. They see, why isn't that just the end of the analysis? Well, because the seizure started when they conducted the traffic stop, so everything they saw in the car flowed from that stop. In your view, it happened before they saw the contraband, in your view? Yes, I think that's it. Okay. From the testimony of Officer Kiesel, as they said, conducted the traffic stop, again, nobody elaborated further upon that, then went up to the car and stopped the seizure. So I'll take away the contraband and ask the same question. They have a report that reported, at least reported, well, we know it reported, somebody picked up a bunch of stuff in a store and dropped it. That was reported. Maybe it's a crime, maybe it's not a crime, but it is suspicious. It could make somebody suspicious. It made somebody suspicious enough to make a call. That is, I mean, in and of itself, look, again, you have to look at these things objectively. People picking up stuff and putting them back in a store or dropping them. They didn't pick it up and put it back on the shelf. They picked it up and dropped it, that's my understanding, which is a little different. It's not a crime necessarily, but it is arguably suspicious. And let's go back to Terry. That wasn't a crime either. They were watching suspicious activity, and they said that was enough to stop and ask a question. So what does there need to be? I think there has to be a basis for it being, or there does have to be a basis for it to be deemed suspicious. That picking up and dropping something in a store, viewed objectively, is not suspicious. It's, you know, people make all those jokes about folding sweaters at the Gap, and this is why we have people folding sweaters at the Gap, because people pick up clothes and don't put them back in the right place. But it's, there's nothing, without more, there's nothing suspicious. There's nothing to say, they were trying to evade surveillance. They were, you know, looking around, or they dropped it when they saw we were watching. That could be suspicious. So it's your position that the information that comes over the radio to police officers, that just isn't enough for them to make an inquiry? I think you definitely have to have something as facts as the basis for the stop. You have to have facts that would support reasonable suspicion for the stop. Rather than just a conclusion, you can say that, you know, oh, this was an attempt to retell theft. Well, why? Why was this an attempt to retell theft? Because you, I mean, it becomes really circular if you say it had to be suspicious because somebody called it in. I mean, that puts a suspicion on pretty much anything that they could report. But you have to, you have to have some sort of information that would show that not only were these people involved, you know, they had the car and the license plate, but you also, they had to be involved in something. So it's, it's, there's two parts here. And the state here and below basically addressed just, really just addressed the first part, which was, okay, this was the car that was identified in the call, but never really dealt with the first part, which was what was suspicious about what they did. And again, this was very bare bones. I don't recall any cases that either party cited about if the person providing the information views it as suspicious, suspicious enough to report it, does the officer responding to the tip have to make their own objective determination that the conduct described was suspicious? I mean, I, you know, who's making, somebody made the assessment it was suspicious. They called it in. Does the officer then need to make their own assessment based on exactly what was called in? The answer would be yes. Well, they have, there has to be something in the record to support a finding of reasonable suspicion. Not just somebody.  Yeah. Somebody had reasonable suspicion. But not just somebody. You're saying the officer has to have reasonable suspicion. The officer's actions have to be based on reasonable suspicion somewhere. And here, again, to clarify a couple of things that got, I think, a little confused in the briefing, is we don't know who called this in. We don't know that it was a law enforcement agency. But you don't dispute that there was a call. There was a call. And everybody agreed that there was a call. And what is this, Rick, do you know what this, I think it's OEMC, what is it? I think it's the 911, the agency that operates the 911. Okay. But, yeah, there's no showing that this was a loss prevention officer. There's no showing this was even Zara. I know this gets mentioned in the briefs here in a couple of places. The only place Zara comes up is when I think it was an officer, he's last testified that he had seen the car near Zara on Michigan Avenue. So we don't even know what store this was, much less who called it in. So we're, you know, we have a conclusion that somehow this was suspicious. But the officer doesn't know and can't answer those questions that you're asking without inquiring of the occupants of the vehicle.  And a consensual encounter with the police doesn't have to have a reasonable suspicion. But a seizure does. So it's definitely not our position that they couldn't do further investigation. They're allowed to rely on a tip that comes over the radio. So long as they take steps to verify it. They can't pull over any car. They can't just stop anybody. But here there were objective facts that they relied upon. That is to say, gosh, it sounds like the same, looks like the same car that we just heard about. What more would they need to do to start an investigation? Again, yeah, they could definitely investigate. It's just they couldn't conduct the stop. That they could walk up to this car as a consensual encounter and investigate from there. But here, again, it was completely off the table that this wasn't in fact a traffic stop. They were seized for Fourth Amendment purposes. So they start the investigation. They approach the vehicle, ask for the driver's license. There's no driver's license. Correct. So in your scenario then, what happens? Well, I mean, all of this proceeds from the initial stop. So at that point is where they have to have reasonable suspicions. So are you stating he could not have asked for the driver's license? They couldn't have stopped or couldn't have seized the vehicle in the first place. If they wanted to not seize it and just go investigate, they could do that. Okay. I'm struggling with this idea of getting back to where Justice Mikva began. There isn't really even a stop here. This is a situation where you pull the car over. That's a stop. They saw the car standing. Not parked. And went over and made an inquiry. I mean, the police officer testified pretty unambiguously that this was a traffic stop. Now, again, for Fourth Amendment purposes, that can be seizing a car that is stopped. That if a person driving that car or in that car would not feel free to leave, they were seized. So they don't have to be proceeding and then stopped to be seized. Again, because the parties were in agreement that this was a traffic stop, this was not elaborated on as to what show of force the officers deployed to make sure that this car couldn't leave. And certainly the state had the opportunity to elaborate on that below if they were going to contest whether or not this was a traffic stop. And so everything in this case followed from that. Seeing things in a car. Seeing that the driver didn't have a license. Taking them out of the car. Searching the trunk. The whole thing followed from that. Stopped right there. And all they had were these conclusions or conclusions based on hunches. I think this is suspicious. Why? This whole article was suspicious. Exactly. Why? If somebody's standing on your front porch, are they committing an attempt at residential burglary? No, you have to have more. Okay, that's a good example. So someone's standing on my porch and I have not invited them. I don't know who they are. I call my local police. The police arrive. Are they able to question the person that's there? It's based on my, I have no idea. You know, we don't know whether my concern is valid or reasonable. They then, the natural progression is that they question the person that's standing on the porch. So similar here, they get the phone call, they question the people that are there. Yeah, the intervening thing between the phone call and the questioning is to stop. Now, in that situation, they could certainly, the police would certainly come to your house and if the person was still standing there, could come up and question them. But they were sitting there in the car when the police arrived. And conducted a Fourth Amendment.  Yeah, so it's, you know, these are hunches. This is a classic hunch. There's something suspicious about what they did. The facts we have don't show anything suspicious. You know, putting things down or dropping things before the final point is the opposite of trying to steal them. It's, you know, the state points to... I will say I agree with you on that. There have been times I'm standing in line and the line is too long. I don't want to wait. I start to talk myself out of the purchase. And maybe I sit it down and decide to leave. Doesn't mean I ever had the intent of stealing it. I just changed my mind. And I think you're making the argument that that could have been the case here. It's, you know, you see lots of raw chicken tucked in among the items at the Juul line because people have decided not to buy it and just dumped it wherever. It's, again, it becomes very circular to say that this was suspicious because somebody phoned it in. There has to be more. The state points to... My time is running low. The state points to an attempt, a retail theft case, where it was clear that the defendants in there were sort of staging things to steal them. And there's no suggestion of that here. It's just they dropped stuff. They left. How can I say they were trying to steal anything? So we would respectfully request this court to reverse Ms. Austin's convictions because all the evidence obtained in her case was a result of this illegal seizure. Okay. Thank you, counsel. Thank you.  Counsel, whenever you're ready. Good morning, and may it please the Court. My name is Assistant State's Attorney Margaret Hillman, and I represent the people of the state of Illinois. First, the evidence here undoubtedly established that the officers had reasonable, articulable suspicion to stop the car that the defendant was riding in. Well, you know what we're going to ask you. Was it a stop? When did it become a stop? Is it a stop? Why did you, why did the state or did the state concede that the officer approaching the car is a stop that requires a reasonable suspicion? So I disagree with counsel that the state conceded that the stop was at the time that the officer approached the car. The, a seizure is a legal and factual determination for the court to make, not for the witness to get up and say that that is the time that the seizure took place. Especially in a motion to quash and suppress evidence where we're talking about the Fourth Amendment, a seizure is something for the court to determine, not for the witness. So did the court determine that this was a seizure, that the time the officer came up and asked for the driver's license, that's a seizure? The court did not make a specific determination regarding when the seizure actually took place. As the justices have pointed out, at the time that the officer approached the car, the car was stopped. There is nothing in the record that would suggest that there was any show of authority in order to get either the defendant or the driver of that car to actually submit to that authority. There is nothing about lights, sirens, any orders that may have been made by the officer at the time that the officer approached the car. The car was parked, standing, stopped, it doesn't go into details in the record, at the time that the officer approached. When the officer approached, it's clear from the record that there were proceeds of a retail theft also in the car. Things undoubtedly part of a retail theft, we're not talking about just clothes with retail tags on them, but clothes with security tags still attached. And importantly, from the stipulated bench... These are in plain view. These are in plain view, yes. And the stipulated bench trial makes clear that the car was also in front of a Zara store at the time that the officers approached it. So taking all of this, looking first at that OEMC call, which was pointed out earlier, is the Office of Emergency Management and Communications. That's where 911 calls come through. So we know that this was a 911 call that came through regarding retail thefts. The officer testified, plural, retail thefts, which one can infer from that, that multiple retail thefts had already taken place. And then in that call, it also described what could have been a retail theft or also could have been an attempt retail theft, where these two individuals were seen grabbing clothes and dropping them before the final point of purchase. What's important to note is that the officer, at the time that they hear this OEMC call, this dispatch, they're not required to rule out every innocent explanation for the actions that they heard. Yes, it's possible that someone could have dropped the clothes because they changed their mind. But based on the fact that this was a 911 call regarding multiple retail thefts and then describing that behavior, it's very unlikely. The officer here had reasonable... Did you play the call in the trial? No, the call is not played in the trial. Did you hear the call? Personally, the call was not contained in the record. Okay, so we don't know that the report was that there were multiple retail thefts. So we do have in the trial transcript, the officer testifies. And what was the basis of the initial stop? The officer says there was a dispatch call of a vehicle involved in retail thefts. Okay, because they added the S. So thefts could have been multiple items from one establishment? It absolutely could have been multiple items. The point is the call described a retail theft. What's important is that a retail theft is complete once a person takes possession of merchandise with the intent to steal it. The person does not have to actually pass the final point of purchase at the time that they have the intent. Here, the way the call described the conduct, it certainly seemed more likely that this was someone who had the intent to take it with them and then dropped it before the final point of purchase. Additionally, the officer had... Are we certain that that was at Zara? Or do we know where this occurred? The record does not indicate what retail store it occurred at. However, it does indicate that the car that matched the make, the year, or the make, the color, and the exact license plate was found outside a Zara store at the time that the officers approached it. Additionally, when the officers approached that very same car that was described, they noted two individuals, which is what also came out on the OAMC call, and then approached the car. And again, at the time that the officers approached the car, the officers were on a street, someplace they are legally allowed to be. The officers, the driver of the car did not have a driver's license or could not provide a driver's license. There's nothing in the record that says the officer even asked for the driver's license first, simply that it wasn't provided. That alone is enough probable cause at that point to arrest the driver. However, the officers then saw in plain view the proceeds of the retail theft. Given the automobile inspection, the officers were then allowed to search the car, ask the occupants out, and detain them. So you indicated that it wasn't indicated in the record that the officer asked for the driver's license first. Correct. The officer, I believe, was asked, was the driver able to provide a driver's license, and the answer was no. But it's important to know what the first contact was when the officer approached the vehicle. Well, so it is the defendant's burden at a motion to suppress to make a prima facie case that their Fourth Amendment rights were violated. In this case, the defense did not make a prima facie case. There is the evidence. The way the evidence is laid out in the record, as we've discussed, is it's difficult to tell even when the initial stop took place, but there were several different points along this timeline where the officers had reasonable articial suspicion to continue their investigation. And as the defense had said earlier today, the officers had reason to investigate. Well, that's exactly what a Terry stop is. It is a short stop for an officer to investigate. Reasonable articial suspicion. And that is what the officers had. This was far more than a hunch. In your view, does there have to be conduct described, either observed by the officer directly, which is not what occurred here, but in this case they're basing their stop on conduct that is described. Does that conduct have to be criminal? Does it have to be suspicious? Does there have to be something about the conduct itself that gives rise to reasonable suspicion? Well, there has to be the officer has reasonable articial suspicion that the person committed or is about to commit a crime. So a reasonable articial suspicion would be that the individuals in the car either attempted a retail theft or committed retail thefts, notably just because the individual grabbed clothes but dropped them before the final point of purchase doesn't mean that they didn't walk out of the store with other things. It doesn't mean that they did either. Absolutely. And that's why the officers had reasonable articial suspicion to continue their investigation into the retail theft. Reasonable articial suspicion is a lesser standard than probable cause. And in this case, the officers did exactly as they should have. They saw the car matching the description and they investigated. They approached the car to continue the investigation into the retail thefts. And in doing so, the officers then gained probable cause to ask both the driver and the defendant out of the car to detain them and to continue their investigation into the retail theft. So you didn't hear the 911 call. We don't know who placed the call. We don't know exactly what was said. We do have officer's testimony indicating that there was it's a drop before final point of sale. Am I saying that correctly? Okay. So I'm hard pressed to find that the suspicion was reasonable or enough, you know, just based on the call. Because at that point, there was no actual theft. Maybe, I mean, you're arguing that there was evidence of intent. But there was no actual theft. And the car was not illegally positioned. So what do we have left here? Just, you know, break that down for me. If this court does not find that the call was enough for a retail theft because the intent was not there, it certainly was an attempted retail theft, which is also a crime. Describing those actions does describe an attempted retail theft. I'm just curious. How does attempted retail theft differ? If you can accomplish a retail theft without ever taking the item from the retailer, how does it differ from attempt? I think that would depend on the facts and circumstances of the specific case. Just so I understand how this works. So what comes over, if you know, what comes over the OEM C call is not the 911 call itself. It doesn't go directly to the police. Somebody takes that 911 call and then makes a report. Is that what happens? So it is my understanding that a 911 call is placed, operators answer the 911 call. The operators then send out through dispatch that the 911 call came through, and they give details to officers in a shorter, more abbreviated version, so that the officers have what they need to respond. And not every 911 call leads to a dispatch. So just the operators are making decisions on sort of real time in terms of setting up dispatches. That I couldn't answer regarding what the 911 call or dispatchers do. But then getting back to the car illegally. Thank you. I had my finger there so it wouldn't hurt. So the car was, the officer testified on direct examination that the car was illegally parked. Again, it is the defendant's burden at that time to show that, or to make a prima facie case. Now, the officer stated the car was illegally parked. However, there is more than one definition for parked. The Chicago Municipal Code does define parking as being an unoccupied vehicle. However, in this case, there was no parking ticket that was written by the officer who did the initial stop. And that's likely because the officer who did the initial stop did not finish the arrest that was passed off to the Cook County Sheriff's Police. So it is unclear from the record if the officer was using a colloquial version of the word park, like Webster's Dictionary, which does not talk at all about if the car was occupied or not, just that it was stopped or standing. Or he was speaking... If I'm understanding correctly, though, this was not a no-stopping zone. It was a no-parking zone. And there was nothing illegal about being stopped there with the occupants. The record does not tell us. The record is completely silent as to what type of zone this was, where the car was parked. The car could have been double parked. The car could have been blocking a fire hydrant. The car could have been in a bus stop. It does not say where the car was. And because there was no violation, without going more into that, there is no indication about what specific municipal code violation was made. The officer did testify that there was a municipal code violation. It was illegally parked. Without going more into that... All this officer had to go on was this phone call description of the vehicle. So the officer had the phone call that described the criminal activity, the description of the vehicle, the two individuals involved, the license plate of the vehicle, the car that was stopped illegally, and that the car also contained two individuals, and that the car was stopped illegally in front of a Zara retail store. So the car came from the phone call as well? That they were parked outside the Zara? No, it did not. Okay, so I want to know just specifically what this officer had to go on in order to approach this vehicle. What was the suspicion? So what we know from the record alone is that the officer knew about retail thefts, that it was two individuals, was given the information that those two individuals grabbed some clothes but dropped them before the final point of sale. The officer was given a make of the car, the color of the car, as well as the Indiana license plate and the exact license plate. And then the officer saw the car illegally parked, noted two individuals were in the car corroborating the call, and... Not illegally parked. Illegally stopped. Okay. We don't know that it was illegal. No, we do know it was illegal because the officer stated it was illegal. We have nothing beyond that conclusion. Correct. We have nothing beyond the conclusion that the officer stated it was illegal. Illegally parked, which technically is not quite correct. Depending on what definition of the word parked, correct. If he was speaking to the municipal code definition or if he was speaking to the more colloquial Webster's definition of the word parked. But there was nothing in the record beyond that testimony as to where the car was parked or what was or wasn't prohibited. That's my recollection, correct. I'm sorry, just getting back. I want to make sure I mean everything. Attempted retail theft, vehicle description, description of the two people. Yes. Okay. And then he was able to make the note that the car was in front of a Zara retail store. We don't know if he knew that a Zara was involved at all, but just that at the time she approached it was in front of a Zara store. Okay. And so for... And I'm sorry, vehicle involved in retail thefts was part of the dispatch, but the only detail provided was the picking up the clothes and dropping them. So part of the dispatch was, I'm calling in, somebody called in about a vehicle involved in retail thefts. That's part of the dispatch, correct? Without hearing the 911 call, I can't say that. That's the testimony. The testimony, yes, that is the testimony from the officer. Presumably the officer, like in most cases, heard the dispatch, and the officer said the dispatch was retail thefts and... Vehicle involved in retail thefts. Correct, two individuals and described the behavior.  So with that, the officer had reasonable... So where did the information about the drop before point of sale come from if that's the case? That's the description of... So that's not retail theft. Well, so... So they didn't say retail theft. They said drop before point of sale. No, they said both. In the dispatch, the officer testifies that the call was a dispatch call of a vehicle involved in retail thefts. Specifically, then, said two individuals who had grabbed some clothes but dropped them before the final point of purchase. So it encompasses both. Okay. stipulated bench trial is certainly enough to establish that the officer had reasonable articial suspicion at the inception, at the stop, based on the OEMC call, but also based on all of the officer's observations of the car, the fact that the car was illegally stopped, but also the plain view of the proceeds from that retail theft after the officer had approached the car on the street. And for these reasons, we ask that this court... So you're saying you can rely on what was observed in plain view to justify the initial stop of asking for the driver's license? Well, as I stated, the record, the court never made a determination, the trial court never made a determination as to when the seizure, the original seizure took place. This court could find that the seizure took place when the officer approached the car, or this court could find that the seizure took place after the officer asked the driver out of the car for not having the driver's license. But the point is the officer had reasonable articial suspicion at the inception based on the OEMC. At the earliest possible. At the earliest possible. So when you say it was, there was enough. Exactly. No matter when the seizure took place, the officer had reasonable articial suspicion for this Terry stop, for the traffic stop, and for the investigation at the inception. But you don't necessarily concede what the defendant is arguing, which is that it clearly took place at the moment the officer started walking towards the car. That's right. You don't concede that, but if it was then, you still think there was enough. Yes. Let me just ask you this. If somebody calls in a 911 call and says, Justice Mitchell, I believe Justice Mitchell is a burglar, and somebody should investigate that further, with no details to support that, is that enough? Is that reasonable suspicion? Does that justify a stop, stopping him? And here's where you can find it. Sitting in the middle seat as presiding judge. Well, that hypothetical differs very much, though, too. Well, no, because part of this dispatch call is, this vehicle is involved in retail thefts. No details. And then the details are something that Justice Johnson aptly points out could be completely innocent conduct. But the officer is not required to rule out any explanation of innocent conduct. I'm just saying it's the beginning, the headline part, enough to be reasonable suspicion. That vehicle is involved in retail thefts. Go investigate. When we're talking about the dispatch for these officers, in order to try to figure out, one, what's going on and what they're looking for, you know, they can't give every single fact at the time that it's happening. These are enough for the officers to get the information that they need, to know what they're looking for, and to investigate the crime that's happening. It's happening in real time. And so in this case, there was enough in the dispatch call. I understand that. I'm saying forget about the details for a second. It's simply saying vehicle involved in retail thefts. Is that enough? If here's a vehicle, here's how it's described. It's involved in retail thefts. No reason why I believe that, but I'm telling you that. I mean, that's a real question. Is that enough? You didn't seem to rely on any briefs at all. I'm just asking, is that enough? The hypothetical you're giving is just very different from the case. But wouldn't it be enough if the officer is able to objectively verify, oh, this car matches the car that was on the dispatch. This license plate matches. Let me go over and make a further inquiry. That's perfectly appropriate. That is what happened here. That is a Terry stop. The officer continued the investigation based on reasonable articulable suspicion, based on what the officer learned through the dispatch call, and what the officer observed while she was present on scene, and she used that information to investigate, which is far more than a hunch. Had she not seen the security tags in the back seat, are we still here? Again, in this case, she did see the security tags. My question is, had she not seen. We take out that one thing, because bags are optional. If you don't want to pay for the bag, you can walk out with your clothing. I don't know if that's for clothing or just groceries in Chicago. But, you know, there are tags. But the security tag, you know, is what kind of shifts it from just clothes on the back seat. So the officer approaches, does not see security tags. Asks for the ID. There's no ID. So in each Fourth Amendment case, it is a factual determination. In this case, yes, you have security tags. In a hypothetical, if you didn't have security tags, you may have other things. In this case, the security tags are simply the icing on the cake. You can't explain away security tags. Isn't driving a vehicle without a driver's license an arrestable offense? Absolutely. Or it ends right there. Absolutely. At whatever city of La Vista, even a petty offense is an arrestable offense. As I stated, at the time that the officer learned that the driver did not have a driver's license, the officer had probable cause at that point to arrest the driver. And certainly to ask the passenger, at least, out of the car. However, at that time, the officer then also had in plain view the clothes with the tags and the security tags attached. So the officer also then had probable cause to search the car and detain both individuals for the ongoing retail theft investigation. So if there are no more questions, the people do ask this panel to affirm the defendant's conviction. Thank you. Counsel, you get the final word. Thank you. There was some question brought up about who bears the burden in these particular situations, at these particular hearings. Now, the defense burden is to show there's a seizure and that the defendant wasn't doing anything to justify that seizure when the police officer sees them. The defense in this case went actually beyond that, presented the testimony of Officer Islas. He said, we need a traffic stop now. Showed that there was a seizure. The defense, you know, showed that there was nothing suspicious about that because it wasn't actually an illegally parked car because there were people in it. So dispelled whatever grounds there would be for making a traffic stop based on that. And then brought in the basis of the OEMC call, or the contents, rather, that this was an attempt to retail theft, but the facts that it was based on was Ms. Austin supposedly picking up clothes and dropping them. So the defense carries. Do you need those facts? Now, that's what I was trying to ask the State. Do you need those facts? If I just call 9-1-1 and say there's an attempted retail theft here and here's the car, do I need to give the facts? It's similar. There has to be proof in the collective knowledge that this seizure was based on. Somebody called it a retail theft. That's not enough to give a police officer a basis for further investigation at a Terry stop if they describe the car involved? Investigation, yes. Terry stop, no. Well, how do you investigate without conducting a Terry stop, right? A Terry stop is a very brief stop where you're making an inquiry of the driver, right? That's what I'm puzzled about. How would you ever investigate anything if you couldn't start with that? But the case law shows the circumstances in which it happened. I mentioned ludiment earlier that you can approach a stopped car and have a consensual encounter with somebody to investigate an offense, and the Fourth Amendment isn't implicated because nobody is seized. That is a perfectly valid investigatory technique. But it doesn't always work because some people don't want to talk to the police. This is true. But we don't really know, to Justice Johnson's point, we don't really know what that first point of contact was. We don't know, for example, the records suggest, but it doesn't that the police officer asked the driver for a driver's license. All we know is that the driver was unable to produce a driver's license. That's what the record says. Correct. Correct. If there's a gap in the record at that point as to that, who does that cut against? The defense is required to present a prima facie case that the state must then rebut. So the defense presented its prima facie case that the seizure began with the terrorist stop, and once the officer testified, or excuse me, the traffic stop, and once the officer testified this was a traffic stop, there is your seizure, and that everything else in this case flowed from there. So, you know, the officer themselves gave us the Fourth Amendment violation here by saying this was a traffic stop. Now, the state did not do anything to contest that. It knew that this was the defense's position. We had opening statements, and then it went back to the officer and said, well, how is it a traffic stop if they were already stopped? What did you do to make them stay there? Why are you calling this traffic stop? There was no elaboration of that there, and that is the state's burden. If they're going to place the seizure somewhere else, they have to rebut the defense's prima facie case that the stop happened right there. So, basically you're arguing that once the officer gave that testimony, the state didn't rebut it, that it takes the other argument regarding the reasonable articulable suspicion off the table, that we can't even consider that now? As far as the OEMC call? Yes. No, that was offered as the other reason why this stop right here would be justified under the Fourth Amendment. Even if the state's position is the alternative is, even if this was not a valid traffic stop for an illegally parked vehicle, the other grounds would be the OEMC call. Okay, so why shouldn't we, you know, if we say, okay, maybe you're right about the stop, why shouldn't we then take their alternative argument that they had enough with the call, with the OEMC call? Because we have the facts behind the OEMC call, and they don't amount to reasonable articulable suspicion because all we have is them picking up the clothes and putting them back. Well, you have the vehicle description, the attempted retail theft, and the description that there were two individuals. We're certainly not arguing that the description of the vehicle was inadequate, that it couldn't provide, if you had more, if you had the basis to stop somebody for something, that you had the right vehicle. But you have to have the basis to stop whoever it is for having done something. It's like you've got the right person to stop, but you don't have any proof that they actually did anything. So it's... I think what we're getting to is it starts with asking the question, with approaching, I have the correct vehicle, so now the officer has to inquire.  Okay, and so here the officer inquired, at some point asked for a driver's license. And so it kind of rolled downhill from there. But... So I guess I don't understand why the officer could, you know, based on your theory, why the officer could not have approached. If they had those three things, you know, why doesn't the officer then follow up with the inquiry? If this had been a consensual encounter, like we have a lot of consensual encounters in the case law where police walk up to people sitting in a vehicle and ask them questions, this would be perfectly valid. Did they walk up to the vehicle and ask questions? After they conducted their stop, everything after that stop is the fruit of that illegal stop, so... I lost my question. A couple of minor points. This was at, the Zara is on Michigan Avenue, and the stop was actually at 20 West Randolph, so it's not like they were stopping right in front of this Zara store. Not Michigan State? Michigan Avenue, I think the Zara... You said 20... 20 West Randolph, I'm not sure exactly how that relates to Michigan Avenue. It's a block west. Yeah, the 20. And also, what the judge found below. The judge's findings in this case were basically that the OEMC call provided, you know, parked, not parked, parked, standing, stopped, whatever. The judge's position was that the OEMC call would justify pulling this car over. That's what the judge said in his initial findings. So... How is this any different than a standard very common case that you get in traffic early, which is a tip to 911. We got a call from Burger King. Somebody just drove through the drive-through. They just tried the car. They looked drunk to the person who was fulfilling their order. My recollection from this is that there are all kinds of cases. That's a perfectly appropriate tip, so long as the police can have some objective measure. It's the same car. It's in the same vicinity. It matches the description they got over the radio. And then they can approach the driver. And then at that point, they make observations. Maybe they ask for a driver's license. I mean, there they have the they look drunk fact. How is that different from, gosh, it looked like they were stealing, but then they dropped it all? I guess, how do you look like you're stealing if you're leaving the items there, I guess would be the key thing here. We all know how people look when they're drunk at Burger King. I think my time is running out. So, thank you, Your Honors. Again, we would respectfully request that this Court reverse Ms. Austin's convictions outright because all the evidence for her case was the result of this illegal traffic stop. Thank you.  Okay, thank you, Counsel, for excellent arguments. Now we take another five minutes.